**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

    Plaintiff,

    vs.                                  14-CR-4067 JAP

**SAMUEL SILVA**,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

In DEFENDANT'S MOTION TO SUPPRESS THE RESULTS OF AN UNDULY

SUGGESTIVE IDENTIFICATION PROCEDURE (Doc. No. 46) (Motion), Defendant Samuel

Silva raises a Fifth Amendment due process challenge to the admission of certain eyewitness

identification testimony. The United States opposes the motion. *See* UNITED STATES'

RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EYEWITNESS

IDENTIFICATION (Doc. No. 64) (Response). Because the Court agrees that the police solicited

the challenged identification using highly suggestive procedures and the Court finds that

admission of the identification would seriously undermine the reliability of the trial, the Court

will grant Defendant's motion and suppress the identification.

**Background**

**I.    Procedural History**

On December 3, 2014, a grand jury returned a six count indictment charging Defendant

Samuel Silva with attempted carjacking, carjacking, using a firearm during a crime of violence,

and illegal possession of a firearm. *See* REDACTED INDICTMENT (Doc. No. 2). All of these

charges arise out of two April 23, 2014 home invasions. *Id.*; *see also* Response at 1. Defendant's

motion to suppress accuses the Albuquerque Police Department of using faulty identification

procedures to obtain an eyewitness identification tying Defendant to the crimes. According to

Defendant, Albuquerque Police Detective David Nix showed one of the victims two photographs

of Defendant, thereby "inexorably" leading the witness to identify Defendant as the perpetrator

of the crime. Motion at 1, 5. In the Response, the United States acknowledges that Detective Nix

obtained an identification from the victim, whom the United States calls "Witness C," based on

two photographs of Defendant. The United States argues, however, that this procedure was not

unduly suggestive and did not render the identification unreliable. Defendant's Reply repeats the

same arguments Defendant asserts in his opening Motion. *See* DEFENDANT'S REPLY TO

THE GOVERNMENT'S RESPONSE TO DEFENDANT' [sic] MOTION TO SUPPRESS THE

RESULTS OF AN UNDULY SUGGESTIVE IDENTIFICATION PROCEDURE (Doc. No. 74)

(Reply).

   During the briefing process, the United States submitted two pieces of evidence to the

Court regarding the crimes and the identification of Defendant: (1) a police report from April 23,

2014, the day of the crimes, Troy Landavazo's Police Report, Exhibit 2 to Response (Doc. No.

64-2), and (2) Detective Nix's offense report describing his investigation of the crime, David

Nix's Supplementary Offense Report, Exhibit 1 to Response (Doc. No. 64-1) (Nix Report).

Defendant did not submit any written materials for the Court's consideration.

   On February 3, 2016, the Court held an evidentiary hearing on Defendant's Motion. At

this hearing, Jacob Wishard and Nicholas Ganjei represented the United States; Brian Pori and

Devon Fooks represented Defendant, who was present. The hearing began with Defendant

calling an expert witness – Dr. Roy Malpass – to testify about memory formation and eyewitness

identification. For the most part, Dr. Malpass's testimony was very general; he described the

stages of the memory formation process and provided common sense examples of circumstances

that might assist or hinder memory formation. For example, he opined that a memory is less likely to be reliable if the observer's attention is divided during the memory acquisition process. He also explained that once a memory is contaminated with false information, *i.e.* once a false memory has displaced an accurate memory, it is usually impossible to recover the original memory because this memory has been erased over, so to speak. In the same vein, he warned that memory decays rapidly with significant detail being lost within one month. Aside from these restatements of well-known and common sense phenomena, Dr. Malpass also highlighted one feature of memory formation which is less intuitive and probably less familiar to the average person: evidence shows that a person is likely to have a less reliable memory of the details of a traumatic incident.

After the Court excused Dr. Malpass, Chris Lucero, the victim whose identification Defendant seeks to suppress, took the stand and testified for roughly thirty minutes about the April 23, 2014 attack and about his subsequent identification of Defendant as the attacker. During this testimony, Counsel for the United States attempted to elicit an in-court identification from Mr. Lucero. Mr. Lucero, however, responded that he did not recognize Defendant and explained that if Defendant was his attacker he had grown a beard and looked "totally different" than on April 23, 2014. Nevertheless, Mr. Lucero testified that his memory of the attacker was crystal clear and that he had not forgotten what the attacker looked like. He confirmed that he had identified Defendant after Detective Nix showed him two pictures of Defendant. Mr. Lucero stated that he was 100% certain Defendant was the perpetrator based on these photographs. This testimony was the only testimony presented regarding Mr. Lucero's photographic identification of Defendant. Neither party called Detective Nix as a witness.

Defendant, however, provided the Court with three recordings: (1) Mr. Lucero's April 23, 2014 911 call, (2) Detective Nix's April 28, 2014 interview of Mr. Lucero, and (3) a snippet of Mr. Lucero's photographic identification. The Court admitted all three recordings into evidence without objections and has carefully listened to the recordings since the hearing adjourned. Based on all of the evidence provided, including the police reports, the recordings, and the testimony of Mr. Lucero, the Court makes the following findings of facts. To the extent there are any minor discrepancies within the evidence, the Court's findings reflect its determination about which piece of evidence is the most reliable evidence with regard to a particular detail.

**Findings of Fact**

### A.  The Home Invasion

1. On April 23, 2014, at around 11:00 a.m., Chris Lucero was at his home when he heard a man trying to open his locked storm door. When Mr. Lucero approached the door to investigate, the intruder displayed a handgun and demanded to be let inside.

2. Mr. Lucero turned around and fled to his bedroom to get his own firearm. While in the bedroom, he heard a shot. Seconds later, the intruder entered Mr. Lucero's bedroom, confronted Mr. Lucero, and demanded the keys to Mr. Lucero's truck. Mr. Lucero responded that there was no need to shoot and told the intruder he would give him the keys, which were in the kitchen.

3. The intruder said, "Let's go," and began backing out of the bedroom. When Mr. Lucero moved to follow him, the intruder shot Mr. Lucero in the leg.

4. During the pre-shooting conversation, Mr. Lucero and the intruder were standing face-to-face about three feet apart. In addition to talking with the intruder, Mr. Lucero focused on remembering what the intruder looked like so that he could provide a description to the

police. Mr. Lucero noted that, as compared to himself, the intruder was taller (about 5'9" to 5'10"), that the intruder was heavier (about 190-210 pounds), and that the intruder had a darker complexion.

5. After being shot, Mr. Lucero fell to the ground. Upon looking up, Mr. Lucero saw that the intruder was continuing to point his gun at him and was continuing to demand that Mr. Lucero move to the kitchen to find the keys to the truck. Mr. Lucero, who was watching to see if the intruder would shoot again, responded that he could not stand. The intruder then grabbed the top of Mr. Lucero's head and proceeded to half-drag Mr. Lucero as Mr. Lucero crawled down the hallway to the kitchen.

6. When they arrived in the kitchen, the intruder started pushing things around on the table looking for the keys. Mr. Lucero directed him to the keys on a hook. After taking the keys, the intruder walked over to Mr. Lucero and put his gun to Mr. Lucero's head. Mr. Lucero pleaded for his life and the intruder rushed out the door and drove away in Mr. Lucero's Ford F-150.

7. The whole crime occurred in roughly 5-10 minutes. Mr. Lucero later explained that from his perspective the attack "happened so quickly," like the snap of a finger. As a result, Mr. Lucero could not be entirely sure how long he and the intruder were together. A lot was going through Mr. Lucero's mind during this time period. For example, Mr. Lucero had regretful thoughts about his inability find his own firearm; Mr. Lucero noted the intruder's firearm, which he thought looked like a nine millimeter; at one point, Mr. Lucero thought about going after the intruder to grab the intruder's gun, but decided not to do so.

8. After the intruder left, Mr. Lucero called 911 to report the crime. On the call with 911, he described the intruder as 5'8" to 5'9", medium to heavy build, in his thirties; wearing dark

clothes, a zip-up hoodie, a blue khaki shirt, and black pants; and having a dark complexion, black hair, and brown eyes.

9.  Sometime after police arrived, Mr. Lucero was taken to the hospital.

10. Later the same day, the Albuquerque Police Department recovered Mr. Lucero's stolen truck abandoned in the driveway of a private residence. Police found blood in the truck.

### B. Subsequent Investigation and Identification of Defendant

11. A few days after being released from the hospital, Mr. Lucero spoke with his neighbor, "Witness A," who was also attacked in her home on April 23, 2014. This neighbor described her attacker to the police as a Hispanic man in his twenties, approximately 5'4" and 120 pounds, wearing a blue or black hoodie and dark pants, with a small tattoo under his left eye. Given the timing of the attacks, among other things, police and Mr. Lucero believed the attacker to be the same person who broke into Mr. Lucero's home.

12. On April 28, 2014, five days after the invasion, Albuquerque Police Detective David Nix met with Mr. Lucero at his home to discuss the crime.

13. During this interview, Mr. Lucero, a woman, who appears to be Mr. Lucero's wife, and Detective Nix (1) discussed Witness A's report that the intruder had a tattoo by his eye and (2) spoke about the discrepancies between Mr. Lucero's description of the suspect and the description provided by Witness A, Mr. Lucero's neighbor. Mr. Lucero expressed confidence that the intruder was not nearly as small as his neighbor's description would suggest. Detective Nix reassured Mr. Lucero and his wife that people often remember attackers differently.

14. Later in the interview, Detective Nix asked Mr. Lucero to describe the intruder. Consistent with his 911-call, Mr. Lucero described the intruder as Hispanic, dark complexioned, 5'8" to

5'10", 185-200 pounds, around 34-years-old, and wearing dark pants, a khaki shirt, and a dark-colored zip-up hoodie. Mr. Lucero also noted that the intruder had light facial hair, looked like he could not grow much of a beard, and was wearing brown "gangster gloves." Detective Nix asked Mr. Lucero to clarify what he meant by a khaki shirt and Mr. Lucero said it was a "gang-bangers" shirt that was blue and gray plaid flannel.

15. Mr. Lucero emphatically denied seeing a tattoo on Defendant's face, although he opined that this might be because the intruder was wearing a hoodie.

16. Detective Nix asked Mr. Lucero if he noticed the intruder bleeding. When Mr. Lucero said no, Detective Nix explained that he was wondering how the intruder might have cut himself. Mr. Lucero and Detective Nix speculated that the intruder injured himself coming through Mr. Lucero's broken glass storm door. Detective Nix stated that the intruder was "bleeding heavily enough" that he dripped blood in Mr. Lucero's stolen truck. Detective Nix informed Mr. Lucero that the police found blood smeared on the driver's side door of the truck, blood on the seat of the car, and droplets of blood on the horn, which Detective Nix thought might have come from a cut on the intruder's arm.

17. Later in the interview, after discussing the other evidence that might lead to the intruder's capture, Detective Nix stated that the "good thing about this case" is that the police found the intruder's blood in Mr. Lucero's truck. Detective Nix explained that the police had ordered testing of this blood, which would normally take some time. Detective Nix stated, however, that the police were trying to have the testing rushed. Detective Nix explained to Mr. Lucero that there was a DNA database with DNA from arrested felons. Detective Nix expressed optimism that the DNA testing would result in a match with this database, or in a "reverse hit," if the intruder were arrested in the future.

18. Towards the end of the interview, Detective Nix promised to do everything he could to catch the perpetrator. He once again reiterated that the police had DNA evidence.

19. On June 25, 2014, Detective Nix received a report from the New Mexico DNA Identification System stating that there was a match connecting Defendant Samuel Silva with the specimens taken from Mr. Lucero's truck.

20. That same day, Detective Nix contacted Mr. Lucero and arranged to meet at Mr. Lucero's house. During this meeting, Detective Nix showed Mr. Lucero a picture of Defendant and obtained a positive identification. In his police report, Detective Nix described the June 25, 2014 identification as follows: "I showed [Mr. Lucero] [Defendant's] driver's license photograph and asked him if there was any reason [Defendant's] DNA (blood) would be in his Ford F150 pickup truck. [Mr. Lucero] advised that he does not know [Defendant] and stated there was absolutely no reason for [Defendant's] blood to be in the truck. Furthermore, [Mr. Lucero] studied [Defendant's photograph and advised he was about eighty percent certain [Defendant] was the man that shot his way into [Mr. Lucero's] home, shot him in the leg and then stole his Ford F150. [Mr. Lucero] advised [Defendant's] complexion in the photograph was somewhat darker than he remembered . . . at which time I showed [Mr. Lucero] a different photograph of [Defendant.] The second photograph of [Defendant] shows him with a somewhat lighter complexion and immediately upon viewing this second photograph, [Mr. Lucero] advised he was one hundred percent sure [Defendant] was the man that robbed and shot him."

21.  As the Nix Report reveals, Detective Nix first asked Mr. Lucero about the presence of

Defendant's blood in his car before asking Mr. Lucero whether he recognized Defendant.[1]

22. Moreover, Detective Nix showed Mr. Lucero two photographs of Defendant back-to-back.

When Mr. Lucero responded that he was only 80% certain the first photograph was a

photograph of his attacker, Detective Nix immediately showed Mr. Lucero a second, lighter

photograph. Mr. Lucero responded that he was now 100% sure that Defendant was his

attacker.[2]

23. After speaking with Mr. Lucero, Detective Nix returned to the Main Police Station and

prepared a photo array (with five photographs), which he showed to Witness A at her home.

Witness A identified Defendant's photograph as the photograph in the array that most

resembled the man that robbed her. However, she stated that she was not 100% sure it was

him, because the man that broke into her house was wearing a hat or hood.

## Discussion

The Supreme Court has developed a two-prong test for deciding whether to suppress

allegedly unreliable eyewitness identifications. First, the court asks whether law enforcement's

challenged identification procedures were impermissibly suggestive. If so, the court must then

determine whether the resulting identification is "nevertheless reliable in view of the totality of

---

[1] The Court notes that at the hearing neither party asked Mr. Lucero about this part of the encounter. Nor did Mr. Lucero bring it up of his own accord. However, the Nix Report is clear about the order of events, and the June 25, 2014 recording memorializing Mr. Lucero's identification confirms that Mr. Lucero and Detective Nix talked about the DNA evidence. While this recording does not start until after Mr. Lucero already saw the second picture, it is clear from the snippet that Detective Nix was reiterating information that had already been discussed.

[2] During the suppression hearing, Mr. Lucero explained that he was only 80% sure about the first photograph because Defendant was heavier in that picture and the picture was darker so Defendant was harder to see. To the extent this explanation differs slightly from the information in the police report (Detective Nix said Mr. Lucero was unsure about the first photograph because it showed Defendant with a darker complexion), the Court credits Mr. Lucero's testimony as more accurate. However, this small discrepancy does not affect the Court's decision. The important fact is that Detective Nix showed Mr. Lucero one photograph, which Mr. Lucero was 80% sure was the offender. Then, Detective Nix showed Mr. Lucero a second, lighter photograph, which Mr. Lucero identified as his attacker with 100% certainty.

the circumstances." *United States v. Sanchez*, 24 F.3d 1259, 1261-1262 (10th Cir. 1994). The

first inquiry focuses on the propriety of the government's conduct, *see Perry v. New Hampshire*,

132 S. Ct. 716, 730 (2012) (due process concerns are only triggered where police arrange a

suggestive identification; in the absence of improper police behavior, courts need not inquire into

the reliability of an identification); the second inquiry focuses on the reliability of the

identification. A court will only suppress an eyewitness identification if both inquiries generate

answers that are defense favorable, i.e. if the identification procedures are unnecessarily

suggestive <u>and</u> the identification is so unreliable that it would be unfair to present it to the jury.

"When a pretrial identification occurs under impermissibly suggestive circumstances and the in-

court identification of the witness is unreliable, the identification should be excluded." *Snow v.*

*Sirmons*, 474 F.3d 693, 720 (10th Cir. 2007).

> I.   ***Detective Nix used unduly suggestive procedures to solicit Mr. Lucero's***
> ***identification of Defendant.***

There is no doubt in the Court's mind that the identification procedures Detective Nix

employed were unduly suggestive. From the moment the Supreme Court recognized a due

process right to exclude from evidence tainted eyewitness identifications, the Supreme Court has

looked unfavorably on "show-up" procedures (procedures where the police show the witness a

single suspect and ask whether or not the witness can identify the suspect as the perpetrator of

the crime). In *Stovall v. Denno*, 388 U.S. 293 (1967), the first Supreme Court case regarding

identification procedures, the Supreme Court acknowledged that the "practice of showing

suspects singly to persons for the purpose of identification, and not as part of a lineup, has been

widely condemned." *Id.* at 302. The passage of years has not eroded this condemnation. In 2012,

the Supreme Court affirmed that the police-arranged hospital show-up at issue in *Stovall* was

"undeniably suggestive," but explained that the *Stovall* Court had upheld the procedure under the

due process clause because the procedure was necessary.[3] *Perry*, 132 S. Ct. at 724 (noting that necessity was "crucial" to the *Stovall* decision).

Following in the Supreme Court's lead, the Tenth Circuit Court of Appeals has declared that "show-up identifications (those involving the identification of a single individual) are less than ideal" and "should be employed only if compelled by extraordinary circumstances." *United States v. Natalini*, 42 F. App'x 122, 127 (10th Cir. 2002). In other words, show-up procedures are inherently suggestive and their use is improper unless the procedures are necessary under the circumstances. *See United States v. De Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993) (agreeing that in-person show-up procedure was impermissibly suggestive); *Mason v. United States*, 414 F.2d 1176, 1182 (D.C. Cir. 1969) (excluding pre-trial eyewitness identification because "[t]he showing of a single photograph is, like all identification procedures involving a single suspect, highly suggestive" and the procedure was "completely unnecessary"); *United States v. Thomas*, 981 F. Supp. 2d 229, 234 (S.D.N.Y. 2013) ("The Second Circuit has consistently condemned the exhibition of a single photograph as a suggestive practice, and where no extenuating circumstances justify the procedure, as an unnecessarily suggestive one.").

The reason for this rule is sound:

> [T]he single photo or one-person showup implies that the police have their man and suggests that the witness give assent. Suggestibility is one of the principal ways in which memory plays tricks and leads to improper identifications.

*United States v. Brown*, 471 F.3d 802, 804 (7th Cir. 2006). Avoiding the use of show-up procedures, where feasible, minimizes the risks of misidentification that are associated with

---

[3] In *Stovall*, the "witness was the only person who could identify or exonerate the defendant; the witness could not leave her hospital room; and it was uncertain whether she would live to identify the defendant in more neutral circumstances." *Perry*, 132 S. Ct. at 724.

asking a victim or witness to accurately remember and identify a stranger, who was observed only briefly, during a traumatic crime. *Id.*

Detective Nix's decision to use a show-up procedure cannot be squared with these principles. The United States has not identified any reason, let alone a good reason, for Detective Nix to have shown Mr. Lucero only one possible suspect during the identification process. This is unsurprising: Detective Nix's failure to present Mr. Lucero with a photographic array or to employ some other identification procedure involving multiple possible suspects was completely unwarranted. According to Detective Nix's police report, immediately after he acquired a positive identification from Mr. Lucero, he returned to the Main Police Station and prepared a five-person photographic array "for" Witness A. That same day, Detective Nix contacted Witness A, showed her the array, and obtained a hesitant identification of Defendant. (Witness A selected Defendant from the array as the man who most resembled her attacker, but she was not 100% sure of her identification). Detective Nix could have obviated any constitutional problems and increased the reliability of Mr. Lucero's potential identification by following the same procedures with both victims. Instead, for absolutely no reason the Court can fathom, Detective Nix used widely disfavored and condemned show-up procedures with Mr. Lucero.

This was unduly suggestive. *See Natalini*, 42 F. App'x at 127. The United States' arguments to the contrary are feeble and unpersuasive. First, the United States maintains that the constitutionality of in-court identifications, which often function like a show-up with the witness's attention invariably drawn to one person sitting at defense counsel's table, lends support to the proposition that "a single photograph identification is [not] per se unduly suggestive." Response at 5-6. The Tenth Circuit Court of Appeals, however, has drawn critical distinctions between pretrial and in-court identifications and has refused to apply the same

standards when evaluating the admissibility of such identifications.[4] *United States v. Thompson*, 524 F.3d 1126, 1135 (10th Cir. 2008). Specifically, even if an in-court identification is suggestive, generally "the question of the suggestiveness or credibility of the in-court identification is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-examination." *United States v. Curtis*, 344

---

[4] To be sure, there is superficial overlap between the standards for admitting a pretrial identification (or an in-court identification based on a corrupted pretrial identification) and a stand-alone in-court identification. A court may disallow an in-court identification, taking the credibility issue away from the jury, where "there is a very substantial likelihood of irreparable misidentification." *Thompson*, 524 F.3d at 1135. This is the same standard courts use to judge the reliability of a pretrial identification. *Romero v. Tansy*, 46 F.3d 1024, 1032 (10th Cir. 1995) (quoting *Simmons*, 390 U.S. at 1261-62)). Here, however, the Court is not yet concerned with the reliability prong of the due process test for evaluating pretrial identifications. The Court is addressing whether the challenged identification is unduly suggestive. Case law regarding in-court identifications is not helpful in this process because (1) when assessing the admissibility of in-court identifications, the Tenth Circuit Court of Appeals does not, as it does with pretrial identifications, separately ask whether the identification procedures used were unduly suggestive and (2) under the one-prong test that applies to in-court identifications, courts allow the use of suggestive procedures in the courtroom that would unquestionably be deemed unduly suggestive if used by the police as part of a pretrial investigation. *Compare United States v. Robertson*, 19 F.3d 1318, 1322 (10th Cir. 1994) (upholding in-court identification where the court required defendant to stand in front of witness and jury alone and don the cap and dark glasses worn by the robber) *with Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) (photographic array was unduly suggestive where victim knew the police had a suspect and people in the array were dissimilar looking). Moreover, even as to reliability, the Tenth Circuit Court of Appeals has drawn a clear distinction between pretrial and in-court identifications. For example, in *Thompson*, the Tenth Circuit Court of Appeals held that "authorities concerning pre-trial identification procedures" do not govern district court decisions to admit in-court identifications. *Thompson*, 524 F.3d at 1135; *see also United States v. Kimball*, 73 F.3d 269, 273 (10th Cir. 1995) (refusing to use *Biggers* factors to assess reliability of in-court identification). As these cases show, challenges to in-court and pretrial identifications are each governed by a separate and distinct set of case law.

F.3d 1057, 1063 (10th Cir. 2003); *see also Thompson*, 524 F.3d at 1135.[5] The same reasoning

and standards do not govern cases, like this one, where the court is tasked with deciding whether

to suppress an allegedly corrupted pretrial identification.

Second, the United States argues that Defendant has not produced any "actual evidence

of pressure" and has therefore "wholly failed to meet his evidentiary burden" of showing that the

particular show-up procedures used by Detective Nix were unduly suggestive. Response at 5.

This argument has no legal footing and the United States does not cite to any case law to support

it. Even in the absence of overt pressure, show-up procedures are suggestive and should be used

sparingly, only where necessary. *Natalini*, 42 F. App'x at 127; *see also* cases cited *supra* pp. 10-

11. Besides, even if it was generally permissible to ask a victim to identify an offender based on

a single photograph (or, as here, a serial presentation of two photographs of the same person),

that would not change the outcome of this case. The procedures Detective Nix employed were

---

[5] In *United States v. Robertson*, 19 F.3d 1318 (10th Cir. 1994), the Tenth Circuit Court of Appeals explained why pretrial identifications are held to a higher standard than in-court identifications.

> The concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged, but from the suggestive pretrial identification. Because the jurors are not present to observe the pretrial identification, they are not able to observe the witness making that initial identification. The certainty or hesitation of the witness when making the identification, the witness's facial expressions, voice inflection, body language, and the other normal observations one makes in everyday life when judging the reliability of a person's statements, are not available to the jury during this pretrial proceeding. There is a danger that the identification in court may only be a confirmation of the earlier identification, with much greater certainty expressed in court than initially.

> When the initial identification is in court, there are different considerations. The jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification.

Id. at 1323 (quoting *United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986)).

far more suggestive than a carefully administered show-up, where the witness is asked in a neutral manner to either identify or exonerate a possible suspect.

In his police report, Detective Nix states that he showed Mr. Lucero Defendant's photograph and asked Mr. Lucero if there was any reason Defendant's blood would be in Mr. Lucero's stolen truck. Mr. Lucero responded in the negative and then, upon studying Defendant's photograph, advised that he was 80% certain Defendant was the man who attacked him. In other words, before Mr. Lucero identified Defendant, Detective Nix clearly communicated that Defendant's blood had been found in Mr. Lucero's stolen truck and, as a result, police believed Defendant was the offender. Such "coaching" has long been recognized as a factor that can lead to a suggestive or tainted identification. *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993). And Detective Nix's carelessness would be troublesome under any circumstances.

Here, it is beyond the pale. Prior to the June 25, 2014 identification, Detective Nix spoke at length with Mr. Lucero regarding Detective Nix's belief that DNA evidence would lead to the offender's capture. Detective Nix told Mr. Lucero that "the good thing about this case" was that the suspect left blood in Mr. Lucero's truck. Detective Nix explained that it would take some time to test this sample, but that he was attempting to have the testing expedited. Detective Nix also told Mr. Lucero about the existence of a DNA database and expressed optimism that the DNA analysis would produce a "hit" or "reverse hit" with the database. Against this backdrop, Detective Nix's initial inquiry about the presence of Defendant's blood in Mr. Lucero's truck assumes a clear meaning. Purposeful or not, Detective Nix effectively told Mr. Lucero that Defendant was the perpetrator.

On top of that, when Mr. Lucero voiced slight reservations about his identification, Detective Nix immediately produced a second photograph of Defendant in an attempt to alleviate these concerns. This added another layer of suggestion to the identification procedures because it reinforced the impression that Detective Nix had an extremely high degree of confidence in Defendant's guilt despite any minor discrepancies between Mr. Lucero's memory of the offender and Defendant's appearance in the first photograph.

Putting aside outright police misconduct, the Court is hard-pressed to think of a set of circumstances more likely to pressure or lead a suspect to identify a particular defendant. At the time of the identification, Mr. Lucero effectively knew there was DNA evidence tying Defendant to the crime. In addition, Detective Nix immediately addressed Mr. Lucero's lingering doubts about the identification by showing him a second picture that better accorded with Mr. Lucero's memory of the attacker. Only at this point did Mr. Lucero state that he was 100% sure Defendant was the offender. Under these circumstances, it is not surprising that Mr. Lucero recognized Defendant. The level of implicit compulsion was extreme. It was also completely unnecessary. Consequently, the Court finds that Defendant has carried his burden of showing that the police procedures were unduly suggestive within the meaning of the due process clause.

## II.    *Given the highly suggestive nature of the identification procedures, there is a very substantial likelihood of misidentification.*

It is well-settled that the use of suggestive police procedures is not enough, standing alone, to require suppression of the resulting eyewitness identification. Once a defendant shows that police employed impermissibly suggestive procedures, "[t]he totality of the circumstances must be considered to determine whether sufficient independent basis for the identification leads one to conclude that the identification is [nonetheless] reliable." *Snow*, 474 F.3d at 720 (quoting *United States v. Williams*, 605 F.2d 495, 498 (10th Cir. 1979)). The Supreme Court has

enumerated five factors – often called the *Biggers* factors after the canonical case *Neil v.*

*Biggers*, 409 U.S. 188 (1972) – that guide this analysis. These factors are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness'
> degree of attention, the accuracy of his prior description of the criminal, the level of
> certainty demonstrated by the witness at the confrontation, and the length of time
> between the crime and the confrontation.

*Grubbs*, 982 F.2d at 1490. These factors, which focus on the witness, "must be weighed against

the corruptive effect of a suggestive pre-trial identification procedure to determine whether the

identification testimony should have been suppressed." *Id.* "The ultimate test is whether the

suggestive [procedures] created a very substantial likelihood of irreparable misidentification."

*United States v. Flores*, 149 F.3d 1272, 1279 (10th Cir. 1998) (internal citation omitted).

This is a high standard; cases suppressing eye witness identifications are sparse. With this

in mind, the Court will summarize the evidence pertinent to each of the *Biggers* factors.

*Opportunity to Observe:* The only opportunity Mr. Lucero had to observe the offender –

a stranger – was during the roughly 5-10 minute day-time invasion of Mr. Lucero's home.

Within this time frame, Mr. Lucero (1) briefly saw the offender at his door, (2) studied the

offender in close proximity during their initial discussion in Mr. Lucero's bedroom, and (3) then

continued to interact with and watch the offender during the subsequent shooting and robbery.

Mr. Lucero's ability to observe the offender's face was impeded, at least to some degree, by the

offender's wearing of a hood.

*Degree of Attention:* Mr. Lucero's attentiveness to the offender and to the offender's

appearance varied widely throughout the commission of the crime. Mr. Lucero was most focused

on the offender's appearance before the offender shot him, when the offender accosted Mr.

Lucero in his bedroom. During this short initial interaction, Mr. Lucero devoted a significant

degree of concentration to noting and remembering the offender's general appearance (for

17

example, his height, weight, clothing, and complexion). In the periods before and after this conversation, however, Mr. Lucero's attention was more divided. For example, after first seeing the offender at this door, Mr. Lucero fled to his bedroom to look for his gun. He could not see and did not pay any attention to the offender during this period. Similarly, immediately after he was shot, Mr. Lucero testified that he was looking to see if the intruder might shoot again. Understandably, many thoughts were going through Mr. Lucero's mind during the crime and he later explained that, from his perspective, the crime happened very quickly, like the snap of a finger.

*Accuracy:* Mr. Lucero accurately described the offender's gender (male) and apparent ethnicity (Hispanic). Additionally, Mr. Lucero's description of the offender's clothing matched the description of the clothing given by the other victim: they both told the police that the offender was wearing dark clothes and a hoodie. Their descriptions, however, significantly differed regarding the offender's size. Mr. Lucero described the offender as being 5'8" to 5'10", medium to heavy build (185-200 pounds). The other victim thought the offender was approximately 5'4" and 120 pounds. Moreover, Mr. Lucero's description arguably varies from Defendant in two regards. (1) Mr. Lucero described his attacker as having light facial hair that looked like he could not grow a beard. Defendant now has a full beard. (2) In his April 28, 2014 interview, Mr. Lucero stated that he did not notice a tattoo under the offender's eye. Defendant, however, has a tattoo under his left eye. (Mr. Lucero has suggested that the offender's hood may have obstructed his view of the tattoo).

*Certainty*: The first time Mr. Lucero saw a photograph of Defendant he was 80% certain Defendant was the offender. After seeing a second, lighter photograph, Mr. Lucero was then

100% certain of his identification. Yet Mr. Lucero testified under oath that he was unable to recognize Defendant, who had grown a beard, during the February 3, 2016 suppression hearing.

*Passage of Time*: Roughly two months passed between the crime and Mr. Lucero's photographic identification of Defendant.

The United States presents a persuasive argument based on the case law that the above factors would not normally indicate that the witness's identification was so unreliable it should be concealed from the jury. All things considered, Mr. Lucero had a passable opportunity to view the offender during normal day-time lighting. To the best of his ability, Mr. Lucero took note of the offender's size, features, clothing, and general appearance. Based on his observations, Mr. Lucero was able to give a general description of the suspect. Finally, within a two-month period, Mr. Lucero identified Defendant with a relatively high level of confidence. Under normal circumstances, there would be no particular reason to doubt the reliability of Mr. Lucero's memory.

But this is not a normal, run-of-the-mill case. As the Court has discussed in great detail, Detective Nix's identification procedures were extraordinarily suggestive. Unfortunately, the five *Biggers* factors indicate that there is a high risk Mr. Lucero's memory was not, for reasons entirely outside his control, strong enough to overcome this suggestion. First, Mr. Lucero only had 5 to 10 minutes, during an on-going crime, to commit the offender's face to memory. Second, given the nature of the crime, Mr. Lucero was not at leisure to simply stare at the offender's face without interruption. His attention was constantly divided, first looking for his own gun, then watching the offender's weapon, then being pulled down the hallway. Furthermore, Mr. Lucero's ability to see the offender's face was obstructed by a hood. All of

these facts indicate that, while Mr. Lucero was able to assemble a general description of the suspect, his memory of the suspect's face was necessarily limited.

The third *Biggers* factor – accuracy – reinforces this conclusion. While there is no basis for finding that Mr. Lucero's description of his attacker was inaccurate, this description does not inspire a high degree of confidence in the reliability of Mr. Lucero's photographic identification "for though [Mr. Lucero] provided general information as to the shooter's age, height, and weight, [he] provided virtually no detail about his face." *Abdur Raheem v. Kelly*, 257 F.3d 122, 141 (2d Cir. 2001). In fact, Mr. Lucero did not notice that the offender had a tattoo near his eye. Whether this was due to Mr. Lucero's divided attention or to the offender's hood, the implication is the same: Mr. Lucero was not able to fully observe or remember distinctive features of the offender's face. These weaknesses in Mr. Lucero's memory could only have been exacerbated by the two-month passage of time and the corresponding and unavoidable erosion of memory.

It was under these circumstances that Mr. Lucero was presented with a picture of someone he essentially knew to be the offender. Memories are impressionable and it would be difficult for any person in these circumstances to resist the unconscious impulse to update, or even replace, an earlier memory with the picture of the suspect. This would be especially true if there was no obvious discrepancy between the picture and the original memory, i.e. if the photograph fit the general description of the suspect. While the Court cannot say for certain that happened in this case, the compulsion was certainly very high. As a result, despite Mr. Lucero's certainty, the Court is not convinced that this is a case where "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances." *See Perry*, 132 S. Ct. at 720. In other words, this is one of the rare cases where sloppy police work creates a "very substantial likelihood of irreparable misidentification."

The Court has not reached this conclusion lightly. In addition to weighing the five *Biggers* factors and the corruptive weight of the suggestive procedures, the Court has also considered the parties' arguments about what Mr. Lucero's hearing testimony signals about the reliability of his identification. *See Sanchez*, 24 F.3d at 1261-1262 (a court must consider whether an identification is reliable based on the totality of the circumstances). As a whole, the Court finds that Mr. Lucero's hearing testimony bolsters the conclusion that there is a very substantial likelihood of misidentification. First, Mr. Lucero was unable to identify Defendant in court as his attacker; he candidly admitted under oath that Defendant looked "totally different." While this speaks to Mr. Lucero's honesty, it cuts against his declarations of certitude. Mr. Lucero insists he was 100% confident in his photographic identification of Defendant. But his inability to recognize Defendant during the suppression hearing indicates that Mr. Lucero's memory of Defendant's features is more limited than Mr. Lucero is aware.[6] This in turn suggests that Mr. Lucero's identification of Defendant has been unwittingly inflated by Detective Nix's suggestive procedures. Thus, the fourth *Biggers* factor – certainty – carries limited weight in this case.

Other aspects of Mr. Lucero's testimony confirm the impression that his memory and his confidence in his memory have been influenced by the suggestive procedures. Most notably, on cross-examination, when asked about whether he saw a tattoo near the offender's eye, Mr. Lucero prevaricated. He first stated that he "couldn't really tell." And then when asked to confirm that he "didn't notice the tattoo," Mr. Lucero changed course and stated that he "saw

---

[6] The appearance of a person can significantly change over time. Normally, a witness's inability to identify a defendant nearly two years after the crime would not, in and of itself, cause the Court to doubt reliability of an identification made two months after the crime. Here, however, Detective Nix's use of highly suggestive procedures has called into question the independent reliability of Mr. Lucero's identification.

something" that he could not identify[7] "on the corner of [the perpetrator's] eye." This testimony is arguably inconsistent with Mr. Lucero's earlier, pre-identification description of the perpetrator. On April 28, 2014, five days after the crime, Detective Nix interviewed Mr. Lucero. During this interview, Mr. Lucero indicated that he had spoken with his neighbor, the other victim, and was aware that she reported that the offender had a small tattoo, perhaps a spider web, by his eye. Mr. Lucero, however, denied seeing a tattoo on the offender's face. Nor did he mention seeing anything else near the offender's eye that may have been a tattoo.[8] As far as the Court is aware, the first time Mr. Lucero mentioned seeing something by the offender's eye was in-court, on cross-examination, many months after his photographic identification of Defendant. This indicates to the Court that the suggestive photographic identification process, wherein police showed Mr. Lucero a photograph of Defendant with a tattoo, influenced Mr. Lucero's memory. In other words, it reinforces the Court's conclusion that Mr. Lucero's pre-trial identification is not sufficiently reliable to send to the jury.

Because this is an unusual conclusion (cases finding identifications unreliable are few and far between), the Court will take this opportunity to point out what it sees as the three flaws in the United States' attempt to analogize this case to the myriad cases finding identifications reliable. First, the United States overstates the accuracy of Mr. Lucero's initial description of the offender – the third *Biggers* factor. According to the United States, Mr. Lucero's description of the offender as "Hispanic, between 5'5" and 5'9," having short, dark hair, and wearing a dark jacket or hoodie" matched both "Defendant's actual appearance" and "the description provided by [the other witness]." The United States did not, however, provide any citations to evidence in

---

[7] Mr. Lucero explained that he did not know what he saw, "but it was like -- I don't know if it was a birthmark or --- but it was something on the corner of his eye."

[8] On the whole, Mr. Lucero was dismissive of his neighbor's description because she related that the offender was much smaller than Mr. Lucero remembered.

the record to support this claim. Thus, the Court was forced to sort through the record looking for

descriptions of Defendant's height, weight, hair color, clothing, etc. Having done so, the Court

has not found any evidence that either victim described the length of the offender's hair or that

Witness A described the offender's hair at all. Thus, there is no evidence that the descriptions

matched in this regard. Moreover, it is clear from the record that while Mr. Lucero and the other

victim both identified the intruder as a Hispanic man wearing a dark hoodie, they sharply

disagreed about the intruder's size. Because there is no evidence in the record regarding

Defendant's height or weight, the Court cannot draw any conclusion about which witness

provided the more accurate description. The Court has summarized the evidence regarding the

accuracy of Mr. Lucero's description above. *Supra* pp. 18. The Court bases its analysis on this

evidence, rather than the United States' unsupported arguments.

      Second, the United States completely disregards the coercive nature of Detective Nix's

identification procedures. Response at 5 ("Defendant has presented no evidence whatsoever . . .

that police suggested, urged, or pressured Witness C into identifying Defendant as his attacker.

Indeed, there is no indication that the police told Witness C that the subject of the photograph

was likely his assailant, or that the DNA found in Witness C's Ford F-150 matched that of

Defendant, or otherwise influenced Witness C's identification in any way."). Consequently, the

United States never grapples with the difficult question facing the Court: whether Detective

Nix's suggestive practices overwhelmed any independent basis Mr. Lucero may have had for

identifying Defendant. In the section of the Response regarding reliability, the United States

reviews the five *Biggers* factors in isolation. The problem with this approach is that the reliability

analysis is not one-sided. After evaluating the *Biggers* factors, a court must weigh this evidence

"against the corruptive effect of a suggestive pre-trial identification procedure" to determine

whether the identification is admissible. *Grubbs*, 982 F.2d at 1490. None of the cases cited by the United States involve highly coercive pretrial identification procedures. *See, e.g., United States v. Rivera-Rivera*, 555 F.3d 277, 284 (1st Cir. 2009) (quick and informal on-the-scene show-up was not unduly suggestive and in the alternative the identifications were reliable); *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000) (expressing doubt that the challenged procedures were unnecessarily suggestive). Thus, these cases are distinguishable.

This is significant because courts regard the presence of a high level of suggestion or coercion as relevant to showing unreliability. *See Flores*, 149 F.3d at 1279 (explaining that an identification based on photographic show-up may be reliable "if the witness has had a clear opportunity to positively identify the suspect prior to the array, the witness expresses a great deal of certainty with regard to the identification, and the circumstances of the identification show a lack of coercive pressure on the identifying witness to make an identification from that photo") (emphasis added). The Court believes this case is more akin to *Mason*, 414 F.2d 1176. In *Mason*, the Court of Appeals upheld the suppression of a photographic show-up because the witness had a strong incentive to identify the robber and these "circumstances maximize[d] the dangers inherent in single-suspect identifications." *Id.* at 1182. While the facts are slightly different here – unlike Mr. Lucero, the witness in *Mason* had reason to believe that making a prompt identification would "get her out of some very hot water" with her employer – similar reasoning applies; Mr. Lucero had strong reason, based on the information Detective Nix had told him, to think Defendant was the perpetrator so there was significant psychological pressure to correctly identify him. This fact, which the United States ignores, is a driving force behind the Court's ruling.

The third and final reason the Court has reached a different conclusion than the United States is the Court's decision to limit its attention to evidence directly relevant to the trustworthiness of Mr. Lucero's pretrial identification. By comparison, the United States asks the Court to rely on external evidence of Defendant's guilt, for example the DNA evidence, to find that Mr. Lucero's identification is reliable. This evidence is quite strong and, if considered, might tip the balance of the analysis in the United States' favor. However, the Court is not persuaded that it is proper for a court deciding whether to admit an eyewitness identification to consider corroborative evidence of a defendant's guilt. *See United States v. Emanuele*, 51 F.3d 1123, 1128 (3d Cir. 1995) ("[O]nly factors relating to the reliability of the identification will be relevant to a due process analysis. Independent evidence of culpability will not cure a tainted identification procedure."). There is a circuit split on this issue. *See Abdur Raheem*, 257 F.3d at 140-141 (describing split).[9] In this Court's view, the more persuasive cases reason that "[r]eliability, in the identification context, means essentially that the witness's recollection was 'undistorted,' and proper inquiry seeks to fathom whether the witness's identification is worthy of reliance, that is, whether it provides a foundation on which the factfinder can reasonably depend." *Id.* at 141. (internal citation omitted). Under this approach, other evidence of a defendant's guilt plays no role in the reliability analysis. If it did, irrefutable evidence of a defendant's guilt could justify admission of even the most wildly unreliable identification – for example an identification made by a witness who was not present at the crime. *Id.*

As far as this Court is aware, the Tenth Circuit has not held otherwise. The United States incorrectly cites *Snow*, 474 F.3d 693 for the proposition that courts may consider the strength of

---

[9] The Second Circuit Court of Appeals listed the Fourth Circuit as a Circuit that had arguably approved of considering unrelated evidence corroborating the defendant's guilt. The Fourth Circuit Court of Appeals, however, has since issued an opinion clarifying that "[e]xtrinsic evidence may play a role in plain-error analysis (or, analogously, harmless error analysis), but it cannot be considered in assessing the reliability of [a witness's] identification testimony." *United States v. Greene*, 704 F.3d 298, 310 (4th Cir. 2013).

the evidence against a defendant in the reliability calculus. In *Snow*, a habeas case, the defendant argued that he received ineffective assistance of counsel because his attorney did not file a due process motion challenging the admission of certain eyewitness identification testimony. *Id*. at 719. As part of its rejection of this contention, the Tenth Circuit Court of Appeals reviewed the *Biggers* factors as they related to the challenged identifications. When discussing the third factor – accuracy – the Tenth Circuit noted that "both [witnesses] provided descriptions of the assailant that were relatively consistent with one another and matched other evidence presented at trial regarding [the defendant's] general appearance around the time of the flea market crimes." *Id.* at 723. The United States cites this portion of the opinion as evidence that the Tenth Circuit was considering the strength of the evidence against the defendant. But this is clearly not the case. The Tenth Circuit framed its analysis under the framework of *Biggers* and only cited the evidence presented at trial as an example of the evidence that would have been presented at a hearing had the defendant's attorney filed a pretrial motion challenging the identification testimony. Contrary to the United States' claims, the Tenth Circuit did not find that this evidence demonstrated that the identifications were reliable because it proved the defendant was guilty. Rather, the Tenth Circuit simply noted that the witness's descriptions matched other evidence regarding the defendant's appearance on the day of the crime. This is a well-settled part of the *Biggers* analysis. In the absence of Tenth Circuit case law holding that a court should consider corroborative evidence of guilt, the Court will, for the reasons already discussed, adhere to the opposite rule followed by the Second, Third, Fourth, and Fifth Circuits.[10]

---

[10] If the Court has overlooked a binding Tenth Circuit case taking the opposing position, the Court trusts the United States will bring this case to the Court's attention. After extensive research, the only Tenth Circuit pretrial identification case the Court could find even remotely supporting the United States' position was *United States v. Smith*, 156 F.3d 1046 (10th Cir. 1998). In *Smith*, as part of its discussion of the five *Biggers* factors, the Court of Appeals noted that the witnesses' identifications were "corroborated" because three other witnesses who had provided similar descriptions of the perpetrator

### III.     Exclusion of Evidence

Defendant asks the Court to suppress "any reference to the identification procedures, exclude evidence of the witness's purported identification of [Defendant] on June 25th and prevent any tainted, in-court identification of [Defendant] by [Mr. Lucero] during the jury trial of this matter." Motion at 1-2. Normally, if a court suppresses a tainted pretrial identification, the court will also suppress any subsequent in-court identification unless the in-court identification rests on an independent and reliable basis. *See Snow*, 474 F.3d at 720 ("When a pretrial identification occurs under impermissibly suggestive circumstances and the in-court identification of the witness is unreliable, the identification should be excluded."). Here, neither party has separately addressed the reliability of Mr. Lucero's potential in-court identification as opposed to his June 2014 pretrial photographic identification, which the Court has determined carries a very substantial risk of misidentification. Instead, both sides appear to assume that suppression of the pretrial identification necessitates suppression of a courtroom identification. The Court sees no reason to deviate from this underlying assumption. The same factors would appear to bear on the reliability of both pieces of evidence. As a result, the Court will grant Defendant's request in its entirety and will suppress evidence about Mr. Lucero's June 25, 2014 photographic identification of Defendant and will bar the United States from attempting to elicit a courtroom identification from Mr. Lucero.

IT IS THEREFORE ORDERED THAT:

1. DEFENDANT'S MOTION TO SUPPRESS THE RESULTS OF AN UNDULY

   SUGGESTIVE IDENTIFICATION PROCEDURE (Doc. No. 46) is GRANTED.

---

also identified defendant. *Id.* at 1051. The Court does not believe this isolated statement, which the Tenth Circuit presented as part of its analysis of the five *Biggers* factors, was meant to announce a broad rule regarding the relevance of extraneous evidence of a defendant's guilt.

2.  The United States may not introduce testimony at trial regarding Mr. Lucero's pretrial identification of Defendant, nor may it ask Mr. Lucero to identify Defendant in front of the jury.


_____

SENIOR UNITED STATES DISTRICT JUDGE